1
2
3
4

Rhonda Lunsford, SBN 219239
P.O. Box 31
San Leandro, CA 94577
Telephone:(510) 759-9529
rrlunsford@hotmail.com

Attorney For Plaintiff

5
6
7
8

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| JOHN DOE<br><br>            Plaintiff,<br><br>     vs.<br><br>U.S. OFFICE OF PERSONNEL<br>MANAGEMENT and DOES 1-10, inclusive.<br>            Defendants. | Case No.: 24-CV-02371-RFL<br>            24-CV-09469-RFL<br>            25-CV-02930-RFL<br><br><br>**EX PARTE APPLICATION FOR<br>INJUNCTIVE AND DECLARATORY<br>RELIEF** |
| JOHN DOE<br><br>            Plaintiff,<br><br>     vs.<br><br>THE REGENTS OF THE UNIVERSITY OF<br>CALIFORNIA AND ROYAL AMBULANCE<br>            Defendants. | |
| JOHN DOE<br><br>            Plaintiff,<br><br>     vs.<br>OFFICE OF PERSONNEL MANAGEMENT,<br>and BLUE CROSS BLUE SHIELD<br>ASSOCIATION, UNIVERSITY OF<br>CALIFORNIA SAN FRANCISCO<br>MEDICAL CENTER, SUTTER EDEN<br>MEDICAL CENTER, ALAMEDA HEALTH<br>SYSTEM, DR. YOUSSEF E. YOUSSEF,<br>VERONICA PERAZA, HYUNJI AHN,<br>SARA DULL and DOES 1-10, inclusive | |

EX PARTE APPLICATION

**TO THE HONORABLE COURT:**

I, Rhonda R. Lunsford, Esq., declare as follows:

I contacted the opposing counsels for Defendants: **U.S. OFFICE OF PERSONNEL MANAGEMENT, THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, BLUE CROSS BLUE SHIELD ASSOCIATION,  EDEN MEDICAL CENTER,  ALAMEDA HEALTH SYSTEM** by email on October 14, 2025 and October 18, 2025 and informed them of Plaintiff's intent to file an Ex Parte Application with the United States District Court, Northern District of California on Monday October 20, 2025, seeking the following emergency order:

1. A Temporary Restraining Order to compel Defendant Regents to arrange emergency safe medical placement in compliance with the federal Quality Improvement Organization (QIO) order issued in Plaintiff's case;

2. An order compelling Defendants Blue Cross and Blue Shield Association/Blue Shield of California to authorize Long Term Acute Care (LTAC) benefits consistent with the OPM directive of August 18, 2023; and

3. An order compelling Defendants Regents, Alameda Health System and Eden Medical Center remove all defamatory and discriminatory remarks contained in Plaintiff's electronic medical record (EMR).

I advised to respond with any objections and the basis of said objections, by 12p.m. on Monday October 20, 2025.

Opposing counsel for **BLUE CROSS AND BLUE SHIELD ASSOCIATION**, indicated that Defendant opposes the Ex Parte application and provided the following reasons:

1. That only remedies under FEHBA are available to Plaintiff

2. OPM's directive of August 18, 2023 did not direct that Plaintiff would be entitled to long-term acute hospital benefits at any facility for the rest of his life.

3. Plaintiff is not likely to succeed on the merits of any of his claims

4. No need for an emergency order because BCBSA will voluntarily follow any directive issued by OPM that Plaintiff is entitled to benefits in connection with any specific treatment and Plaintiff has not identified any current urgency.

5. Plaintiff has not identified any statute, rule or order that authorizes an Ex Parte filing.

Opposing Counsel for **EDEN MEDICAL CENTER** indicated that he would oppose the Ex Parte application. Opposing counsel said that his reason for opposing the Ex Parte application are:

1. Counsel just stated that Eden Medical Center would object to this filing.

Counsel for **U.S. OFFICE OF PERSONNEL MANAGEMENT, THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and ALAMEDA HEALTH SYSTEM** never responded with support or opposition to the issue of Plaintiff's Ex Parte application.

  This Ex Parte application is based upon a Memorandum of Points and Authorities, Declaration in Support, Declaration of Plaintiff JOHN DOE, the complete files and records in this action and upon such oral and documentary evidence as may be allowed at the hearing of this motion.

          Respectfully submitted,

DATED: October 20, 2025

          */s/* Rhonda Lunsford
          Rhonda Lunsford, Esq.
          Attorney for Plaintiff

1  Rhonda Lunsford, SBN 219239
   P.O. Box 31
2  San Leandro, CA 94577
   Telephone:(510) 759-9529
3  rrlunsford@hotmail.com

4  Attorney For Plaintiff

5

6                    **UNITED STATES DISTRICT COURT**

7                   **NORTHERN DISTRICT OF CALIFORNIA**

8                       **SAN FRANCISCO DIVISION**

9

10 JOHN DOE                                )  Case No.:  24-CV-02371-RFL
                                            )             24-CV-09469-RFL
11           Plaintiff,                     )             25-CV-02930-RFL
                                            )
12    vs.                                   )
                                            )  **MEMORANDUM OF POINTS AND**
13 U.S. OFFICE OF PERSONNEL                 )  **AUTHORITIES IN SUPPORT OF EX**
   MANAGEMENT and DOES 1-10, inclusive.     )  **PARTE APPLICATION FOR**
14                                          )  **INJUNCTIVE RELIEF AND**
             Defendants.                    )  **DECLARATORY RELIEF**
15 JOHN DOE                                 )
                                            )
16           Plaintiff,                     )
                                            )
17    vs.                                   )
                                            )
18                                          )
   THE REGENTS OF THE UNIVERSITY OF         )
19 CALIFORNIA AND ROYAL AMBULANCE           )
                                            )
20           Defendants.                    )
                                            )
21 JOHN DOE                                 )
                                            )
22           Plaintiff,                     )
                                            )
23    vs.                                   )
   OFFICE OF PERSONNEL MANAGEMENT,          )
24 and BLUE CROSS BLUE SHIELD               )
   ASSOCIATION, UNIVERSITY OF               )
25 CALIFORNIA SAN FRANCISCO                 )
   MEDICAL CENTER, SUTTER EDEN              )
26 MEDICAL CENTER, ALAMEDA HEALTH           )
   SYSTEM, DR. YOUSSEF E. YOUSSEF,          )
27 VERONICA PERAZA, HYUNJI AHN,             )
   SARA DULL and DOES 1-10, inclusive       )
28 _____ )

1

## <u>TABLE OF CONTENTS</u>

2    **I. INTRODUCTION**                                                                 2
     **II. FACTUAL AND PROCEDURAL HISTORY**                                              4
3        A. Background and Medical Necessity                                             4
         B. UC Davis Knowledge and Unsafe Discharge                                      5
4        C. Deterioration and Life-Threatening Conditions at Integrity                   6
         D. Loss of Therapy and Rapid Physical Regression                               8
5        E. Blue Shield Ongoing Noncompliance with Federal Mandate                      9
         F. Discriminatory Record Characterizations and Barriers to Care                9
6        G. Current Emergency and Procedural Posture                                    10
     **III. ARGUMENT**                                                                   11
7        A. Legal Standard                                                               11
         B. Plaintiff Faces Immediate, Irreparable Harm Without Emergency Intervention   12
8        C. Plaintiff Is Likely to Succeed on the Merits                                 13
             1. Regents Violated Federal Safe-Discharge Requirements and Defied the QIO
9            Determination                                                               13
             2. Blue Cross and Blue Shield Association Refusal to Implement OPM LTAC
10           Approval Is Action Unlawfully Withheld Under the APA                        14
             3. Defendants Conduct Violates Disability-Discrimination Statutes (Section
11           504/ADA/Section 1557)                                                       15
             4. Integrity Conduct Constitutes Dependent-Adult Abuse Under California Law 16
12       D. The Balance of Equities and the Public Interest Strongly Favor Injunctive Relief  17
     **IV. REQUESTED RELIEF**                                                            18
13           1. Immediate Medical Transfer to a Safe, Qualified Facility                 18
             2. Enforcement of OPM August 18, 2023 Final Decision                        19
14           3. Correction of Discriminatory and Derogatory Medical Record Characterizations  20
             4. Plaintiff Right to Participate in All Future Discharge Planning          21
15           5. Non-Retaliation                                                          21
             6. Monitoring and Status Conference                                         22
16           7. Bond                                                                     22
     **V. CONCLUSION**                                                                   23

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE
APPLICATION FOR INJUNCTIVE AND DECLARATORY RELIEF

# TABLE OF AUTHORITIES

## CASES

*Alexander v. Choate*, 469 U.S. 287 (1985)                                    15
*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011)    11
*Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668 (9th Cir. 1988)       12
*Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288 (D.C. Cir. 2009)        12
*Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009)                         22
*Norton v. Regents of Univ. of Cal.*, 608 F.3d 550 (9th Cir. 2010)            14
*Schweiker v. McClure*, 456 U.S. 188 (1982)                                   13
*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008)                11,
    17

## STATUTES

5 U.S.C. § 706(1)                                                             14
5 U.S.C. § 8902(j)                                                            14
29 U.S.C. § 794 (Section 504, Rehabilitation Act)                             15
31 U.S.C. § 1342                                                              10
42 U.S.C. § 12101(a)(2) (ADA)                                                 18
42 U.S.C. § 12132 (ADA Title II)                                             15
42 U.S.C. § 18116 (Section 1557, ACA)                                         15
Cal. Welf. & Inst. Code § 15610.07                                            16

## REGULATIONS

5 C.F.R. § 890.105                                                            18
5 C.F.R. § 890.105(a)(2)                                                      14
42 C.F.R. § 405.1200 et seq.                                                  13
42 C.F.R. § 482.43                                                            13,
    18, 21
42 C.F.R. § 482.43(b)                                                         13
42 C.F.R. § 483.10                                                            21

## RULES

Federal Rule of Civil Procedure 65(b)(1)                                      11
Federal Rule of Civil Procedure 65(c)                                         18

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE
APPLICATION FOR INJUNCTIVE AND DECLARATORY RELIEF

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  <u>INTRODUCTION</u>

Plaintiff **John Doe** is a disabled African-American federal employee suffering from **Systemic Sclerosis with Dermatomyositis overlap**, **post–stem-cell transplant complications**, and severe mobility limitations. He requires two-person assistance for transfers, daily wound care, bi-weekly **IVIG infusions** through a central chest port, and continuous skilled nursing.

On October 6, 2025, UC Davis Medical Center discharged Plaintiff to Integrity Care Group despite Plaintiff having filed an appeal with Livanta, the federal Quality Improvement Organization (QIO), challenging the unsafe discharge. On October 8, 2025, Livanta issued a determination finding that UC Davis's discharge was unsafe and ordering corrective action. UC Davis has refused to comply.

Although the actions at issue occurred at UC Davis Medical Center, that facility operates under the authority and control of **The Regents of the University of California**, a proper defendant in this action. Accordingly, all injunctive orders directed at UC Davis shall apply to The Regents, including its officers, agents, employees, and those acting in concert with them.

Since his admission to Integrity, Plaintiff's condition has **deteriorated catastrophically**. His hospital-acquired pressure ulcer—initially stable—is now **actively bleeding** and showing deep tissue damage, and additional wounds have developed. He is **seven days overdue** for life-sustaining IVIG therapy, leaving him completely immunocompromised and at imminent risk of **sepsis and death**. Integrity's Medical Director, **Dr. Veerapa**, has seen Plaintiff only once—on October 7—and has since provided **no medical oversight**, despite missed infusions, worsening wounds, and

documented medication errors. Nursing staff have admitted to lacking current port-training and suggested "watching a video" to learn how to access Plaintiff's port. Out of fear for his life, Plaintiff has refused unsafe procedures that could destroy his only viable vascular access.

Plaintiff's medications are routinely mishandled or omitted. He is given **Miralax three times daily** instead of once; a critical **immunosuppressant** was withheld for **eleven days** despite availability; and infusions are administered undiluted, causing risk of tissue injury. These failures are compounded by the facility's chronic understaffing, lack of infection control, and absence of physician supervision—all documented in **California Department of Public Health records**, which show **54 substantiated deficiencies** against Integrity from 2022–2025 for medication mismanagement, wound-care failures, and infection-control violations.

This emergency is the predictable outcome of systemic neglect. In **August 2023**, the **U.S. Office of Personnel Management (OPM)** issued a final, binding order directing **Blue Shield of California Federal Employee Program** to authorize **Long-Term Acute Care (LTAC)** benefits for Plaintiff. Blue Shield has refused to comply for more than two years. Had OPM's order been honored, Plaintiff would have received appropriate care in an LTAC facility rather than languishing in a custodial environment incapable of meeting his medical needs.

Compounding this crisis, UC Davis and other UC Regents hospitals have circulated **discriminatory and stigmatizing notations** in Plaintiff's medical records— labeling him "non-compliant," "difficult," and a "hospital hopper." These false, non-clinical characterizations have been disseminated to skilled nursing and LTAC facilities

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE
APPLICATION FOR INJUNCTIVE AND DECLARATORY RELIEF

and to insurers, leading to repeated **denials of admission** and **reduction of care** based on bias against disability-related behaviors.

This application seeks **immediate judicial intervention** to prevent irreparable harm and probable death. Plaintiff respectfully requests that the Court: (1) compel **Regents** to arrange safe, medically appropriate placement consistent with Livanta's federal determination; (2) order **Blue Shield of California FEP** to comply with **OPM's 2023 LTAC authorization**; and (3) enjoin all Defendants from perpetuating discriminatory and retaliatory practices that continue to endanger Plaintiff's life and deny him the care to which he is lawfully entitled.

## II. FACTUAL AND PROCEDURAL HISTORY

### A.  Background and Medical Necessity

Plaintiff **JOHN DOE** is a disabled African-American federal employee who suffers from **Systemic Sclerosis with Dermatomyositis overlap**, **calcinosis cutis**, **severe vascular disease**, **immunodeficiency**, and **post–stem-cell transplant complications**. These chronic and progressive autoimmune disorders require intensive, continuous medical care including **bi-weekly intravenous immunoglobulin (IVIG) infusions**, **sodium thiosulfate infusions three times per week**, daily **wound management**, **infection control**, **therapeutic rehabilitation**, and ongoing **skilled nursing oversight**.

Because Plaintiff's veins are collapsed, all intravenous treatments must be administered through a **surgically implanted central chest port**, which serves as his sole viable vascular access. Any interruption of IVIG therapy renders Plaintiff completely immunocompromised, exposing him to imminent risk of sepsis and death from otherwise minor infections.

### B. UC Davis's Knowledge and Unsafe Discharge

From **March through October 2025**, Plaintiff was hospitalized at **UC Davis Medical Center** under the care of the **Regents of the University of California**. UC Davis medical staff were fully aware of Plaintiff's fragile condition and his reliance on port-based infusions. At UC Davis only qualified nurses were permitted to access Plaintiff's port.

Despite this knowledge, on **October 6, 2025**, UC Davis discharged Plaintiff to **Integrity Care Group**, a congregate living health facility located in Manteca, California, which has **no port-qualified nurses**, **no wound-care specialists**, and a **documented record of infection-control violations**. At the time of discharge, Plaintiff had an active appeal pending with **Livanta**, the **federal Quality Improvement Organization (QIO)** responsible for reviewing hospital discharges under Medicare regulations.

UC Davis discharged Plaintiff with his port already accessed from the hospital—a temporary workaround that masked Integrity's lack of qualified staff for 7 days but ensured a predictable medical crisis once the temporary access expired and re-access became necessary.

On **October 8, 2025**, Livanta issued its initial **verbal determination**, followed by a **written decision** that was received on **October 14, 2025** finding UC Davis's discharge **unsafe and inappropriate**, ordering that the hospital **must arrange a safe discharge plan** and continue to provide medically necessary care. Despite these binding federal findings, **UC Davis has refused to comply**, leaving Plaintiff stranded in a facility incapable of meeting even minimum medical standards.

**C. Deterioration and Life-Threatening Conditions at Integrity**

Since his admission to Integrity on October 6, 2025, Plaintiff's condition has **deteriorated**. His hospital-acquired **coccyx pressure ulcer**, initially improving at UC Davis, is now **bleeding and deepening**, and new wounds have appeared on his buttocks due to improper bedding, inadequate turning, and lack of wound-care expertise.

Integrity has **no consistent physician oversight**. The facility's Medical Director, **Dr. Veerapa**, met Plaintiff only once on October 7, 2025, during a dispute over coerced consent forms, and has since provided **no follow-up care** despite worsening wounds, missed infusions, and medication errors.

Nursing staff have admitted they have not accessed a port "in over a year and a half" and proposed "watching a video" to remember how. Fearing infection and permanent loss of his only vascular access, Plaintiff has refused to allow unqualified staff to handle the port. As a result, his port was de-accessed on **October 15**, and **no one has been able to re-access it since**, halting all IV infusions. Plaintiff is now more than **seven days overdue for IVIG**, completely immunocompromised, and suffering from **progressive calcinosis cutis** and increasing pain.

Integrity's medication administration is dangerously erratic. Plaintiff's **Miralax** is given **three times daily** instead of once; his **immunosuppressant** was withheld for **eleven consecutive days**; and infusions are administered **undiluted**, causing potential vein and tissue damage. Medication orders are frequently delayed, mishandled, or ignored, and doses often sit improperly reconstituted.

Integrity's infection control is grossly deficient. Staff fail to wear protective gear which includes gowns and masks, and fail to follow hand hygiene protocols. According to **California Department of Public Health records**, Integrity has accumulated 79 documented complaints and incidents resulting in **54 substantiated deficiencies** and one state enforcement action between 2022 and 2025, including violations for **infection control**, **medication mismanagement**, **wound-care failures**, and **inadequate nursing supervision**—the precise areas in which Plaintiff requires expert care.

**D. Loss of Therapy and Rapid Physical Regression**

During prior hospitalizations, Plaintiff received structured physical and occupational therapy four to five days per week, which improved his endurance, strength, and flexibility. At Integrity, therapy has been virtually eliminated. Although his physicians ordered aggressive therapy, he now receives only about **90 minutes per week of physical therapy** and **no occupational therapy**. Staff falsely claim he cannot leave his room for therapy, causing severe deconditioning, muscle stiffness, and loss of mobility.

**E. Blue Shield's Ongoing Noncompliance with Federal Mandate**

This deterioration is the direct result of **Blue Shield of California Federal Employee Program's** prolonged refusal to comply with a **final administrative order** issued by the **U.S. Office of Personnel Management (OPM)** in **August 2023**. OPM ordered Blue Shield to authorize coverage for **Long-Term Acute Care (LTAC)** hospitalization for Plaintiff—a level of care suitable for patients requiring continuous skilled nursing and IV therapy. For more than two years, Blue Shield has defied that order. Had it complied, Plaintiff would now be home rather than languishing in a custodial facility unfit for medical treatment.

**F. Discriminatory Record Characterizations and Barriers to Care**

Plaintiff's ability to access safe facilities has been further undermined by **discriminatory and stigmatizing notations** in his medical records, labeling him "non-compliant," "difficult," and a "hospital hopper." These non-clinical and derogatory characterizations have been circulated to facilities and to insurers, resulting in repeated refusals of admission and denial of appropriate levels of care in violation of federal disability and civil rights protections.

**G. Current Emergency and Procedural Posture**

Plaintiff filed this federal action on **March 30, 2025**, alleging violations of the **Federal Employees Health Benefits Act (FEHBA)**, **Administrative Procedure Act**

**(APA)**, **Rehabilitation Act**, **42 U.S.C. § 1983 and other antidiscrimination statutes**, against

multiple Defendants including the **U.S. Office of Personnel Management (OPM)**,

the **Regents of the University of California**, and **Blue Shield of California FEP**.

   On **October 15, 2025**, OPM moved to stay case deadlines under the Anti-Deficiency

Act citing the federal appropriations lapse. Plaintiff has opposed that motion, demonstrating

that the **life-and-safety exception** of 31 U.S.C. § 1342 applies. Plaintiff brings this Ex Parte

Application under Rule 65(b)(1) because it is clear that Plaintiff will suffer immediate and

irreparable harm before the adverse party can be heard in opposition.

   Because Plaintiff's health and life are now in imminent danger and Defendants have

refused to comply with binding federal directives, Plaintiff now brings this **Ex Parte**

**Application for Temporary and Preliminary Injunctive and Declaratory Relief** seeking

an order compelling:

(1) Regents to immediately arrange and fund safe placement consistent with Livanta's QIO

determination;

(2) Blue Shield to implement OPM's final 2023 LTAC authorization; and

(3) all Defendants to cease discriminatory practices and administrative obstruction that have

deprived Plaintiff of essential medical care.

 Unless this Court intervenes, Plaintiff faces irreversible harm and probable death from

sepsis, wound infection, untreated autoimmune disease, and progressive disability resulting

directly from Defendants' coordinated neglect and noncompliance.

### III. <u>ARGUMENT</u>

**I. Legal Standard**

   This application is brought pursuant to **Federal Rule of Civil Procedure 65(b)(1)**,

which authorizes the Court to issue a temporary restraining order without notice when specific

facts in an affidavit or verified complaint clearly show that **immediate and irreparable injury, loss, or damage will result before the adverse party can be heard in opposition**, and when the movant's attorney certifies in writing the efforts made to give notice and why notice should not be required. Plaintiff **John Doe's verified declaration** establishes that he faces imminent, life-threatening harm each day he remains at Integrity Care Group without IVIG infusions, qualified nursing, or physician oversight. The accompanying **Attorney Certification of Notice** further satisfies Rule 65(b)(1)(B) by documenting reasonable efforts to notify all defendants and explaining why further delay would likely result in sepsis or death before a noticed hearing could occur. Accordingly, issuance of an **ex parte temporary restraining order** is warranted to preserve Plaintiff's life and prevent irreparable injury pending a full hearing on the preliminary injunction.

A temporary restraining order/preliminary injunction is warranted where the movant shows (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent relief, (3) the balance of equities tips in the movant's favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011) (sliding scale).

**II. Plaintiff Faces Immediate, Irreparable Harm Without Emergency Intervention**

Plaintiff confronts imminent, life-threatening harm that money damages cannot remedy. His hospital-acquired pressure ulcer is now **actively bleeding**, indicating deep tissue breakdown and exponential infection risk each day; he is **seven days overdue for IVIG**, leaving him **immunocompromised** and at imminent risk of sepsis; Integrity's RN admits she has not accessed a central port "in over a year and a half" and would need to "watch a video," creating an immediate risk of line infection, sepsis, and loss of Plaintiff's only vascular access; and there has been a **complete absence of physician oversight for 12 days** despite worsening

wounds, missed infusions, and medication errors. These conditions reflect not just a risk of harm but **ongoing harm** that compounds daily.

The Ninth Circuit consistently recognizes threats to health and safety as irreparable injury. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); see also *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009) (loss of life or health constitutes irreparable harm). Plaintiff's deterioration is objectively documented by missed essential treatments, medication deviations (e.g., Miralax three times daily instead of once, undiluted sodium thiosulfate infusions), and photographic evidence of worsening wounds. Immediate injunctive relief is necessary to prevent sepsis, permanent loss of function, and death.

**III. Plaintiff Is Likely to Succeed on the Merits**

**A. Regents Violated Federal Safe-Discharge Requirements and Defied the QIO Determination**

Hospitals must provide discharge planning that meets each patient's post-hospital needs, developed and reviewed by qualified personnel, including evaluation of needed post-hospital services and their availability. 42 C.F.R. § 482.43; id. § 482.43(b). When a Medicare beneficiary appeals discharge, the QIO's review provides binding oversight. 42 C.F.R. § 405.1200 et seq. Hospitals must comply with QIO directives.

UC Davis discharged Plaintiff on **October 6, 2025** to Integrity, despite knowing the facility lacked port-qualified nurses, had no physician oversight, and carried **54 deficiency citations** over three years for precisely the domains Plaintiff needs (medication, infection control, nursing supervision, wound care). On **October 8**, **2025**, Livanta (the QIO) determined the discharge was **unsafe** and ordered corrective action. UC Davis has refused to comply. The QIO's expert determination confirms UC Davis's violation of § 482.43. See, e.g., *Schweiker v. McClure*, 456 U.S. 188, 195 (1982) (courts accord substantial weight to decisions of entities

with specialized expertise). Ongoing noncompliance with Conditions of Participation warrants

immediate injunctive relief compelling safe placement.

**B. Blue Cross and Blue Shield Association's Refusal to Implement OPM's LTAC Approval Is Action "Unlawfully Withheld" Under the APA**

Under the APA, courts "shall… compel agency action unlawfully withheld or

unreasonably delayed." 5 U.S.C. § 706(1). FEHBA authorizes OPM to issue **final** benefit

decisions binding on carriers and covered individuals. 5 U.S.C. § 8902(j); 5 C.F.R. §

890.105(a)(2).

On **August 18, 2023**, OPM issued a **Final Agency Decision** (Control No. Y23173003)

ordering Blue Shield of California, a local affiliate of Blue Cross and Blue Shield

Association's Federal Employee Program, to authorize and pay for LTAC care for Plaintiff.

For more than two years, Blue Shield of California has refused to implement that order—

asserting that a hospital referral constituted a "new admission" requiring a "new appeal." That

position directly contradicts 5 C.F.R. § 890.105(a)(2)'s binding effect and nullifies OPM's

authority. This Court may compel immediate compliance. See, e.g., *Norton v. Regents of Univ.

of Cal.*, 608 F.3d 550, 560 (9th Cir. 2010) (APA § 706(1) compulsion of unlawfully withheld

action). Had Blue Shield of California complied in 2023 and approved the LTAC care

recommended by Plaintiff's providers, he would be home by now rather than in a custodial

facility fighting for his life.

**D. Defendants' Conduct Violates Disability-Discrimination Statutes (Section 504/ADA/Section 1557)**

Section 504 of the Rehabilitation Act, Title II and Title III of the ADA, and Section 1557

of the ACA prohibit discrimination on the basis of disability in programs receiving federal

funds. 29 U.S.C. § 794; 42 U.S.C. § 12132; 42 U.S.C. § 18116. These statutes bar not only

intentional bias but also practices that deny meaningful access. *Alexander v. Choate*, 469 U.S.

287, 299–301 (1985).

Regents and other providers inserted stigmatizing, non-clinical labels into Plaintiff's records suggesting that patient is, "non-compliant," "difficult," and a "hospital hopper"—penalizing disability-related needs (complex equipment, frequent hospitalization due to inadequate post-acute care) and protected self-advocacy (refusing unsafe procedures). Those labels were circulated to skilled nursing facilities, LTACs and insurers, leading to **denials of admission** and **reductions of care**, creating a self-reinforcing cycle: unsafe discharge → complications → readmission → further stigma.

Further, discharging a medically complex, immunocompromised patient to a facility with 54 deficiencies and no qualified port or wound-care capacity—while ignoring a pending federal appeal and subsequent QIO order—denies meaningful access to care and demonstrates discriminatory treatment.

**E. Integrity's Conduct Constitutes Dependent-Adult Abuse Under California Law**

California defines dependent-adult abuse to include "neglect" and the deprivation by a care custodian of goods or services necessary to avoid physical harm or mental suffering. Cal. Welf. & Inst. Code § 15610.07.

Integrity's actions meet multiple statutory predicates:

> • **Withholding care to coerce waivers**: On October 6–7, Integrity withheld medications and wound care unless Plaintiff signed forms authorizing chemical/physical restraints and assigning their physician as his primary care physician.
> • **Physician abandonment**: The Medical Director saw Plaintiff once (October 7) and provided **no** oversight thereafter despite bleeding wounds and missed infusions.
> • **Forcing impossible choices**: Integrity's RN admitted she had not accessed a port in 18+ months and would "watch a video"—forcing Plaintiff to choose between unsafe port access (risking sepsis and loss of his only access) or foregoing life-sustaining IVIG.
> • **Systemic neglect**: Medication omissions and errors (e.g., Miralax TID; 11-day lapse in immunosuppressant; undiluted sodium thiosulfate), serial wound-care by unqualified staff, lack of therapy (≈90 minutes PT/week; **no OT** despite orders), absent infection control, and inadequate equipment (no 88-inch low-air-loss bed for a 6'7" patient).

-14-

This record establishes ongoing neglect and abuse warranting immediate injunctive relief.

**IV. The Balance of Equities and the Public Interest Strongly Favor Injunctive Relief**

The equities are not close. Plaintiff faces imminent death or permanent injury from sepsis, tissue necrosis, and systemic infection amongst other medical complications. Defendants' "burden" is simply to do what federal law already requires: Regents must arrange safe placement consistent with § 482.43 and the QIO's order; Blue Shield must comply with OPM's binding 2023 decision. And all defendants must comply with federal nondiscrimination statutes. Defendants cannot claim hardship from obeying the law. See *Winter*, 555 U.S. at 32 (no cognizable harm from compliance).

The public interest is compelling. Enforcing Medicare's safe-discharge regulations protects medically fragile patients from exactly this scenario; enforcing FEHBA's appeals scheme preserves OPM's final authority and ensures promised benefits to federal workers; and enforcing disability-rights statutes vindicates Congress's mandate that patients with disabilities receive **meaningful access** to care. 42 U.S.C. § 12101(a)(2); 42 C.F.R. § 482.43; 5 C.F.R. § 890.105. An injunction here promotes patient safety, respect for federal administrative orders, and nondiscriminatory medical practice.

**IV. <u>REQUESTED RELIEF</u>**

For the reasons stated above, Plaintiff respectfully requests that the Court issue an **Emergency Temporary Restraining Order** and set an **Order to Show Cause re: Preliminary Injunction**, providing the following relief:

**1. Immediate Medical Transfer to a Safe, Qualified Facility**

**ORDER** Defendant the **Regents of the University of California**, within **24 hours**, to:

a. Arrange Plaintiff's **immediate transfer** to a **qualified medical facility outside of the UC Regents hospital network** that is capable of providing comprehensive care, including:

- 24-hour physician oversight by board-certified internal-medicine or hospitalist staff;
- Registered nurses certified in central-port access and IV infusion management;
- Daily wound-care services by certified nurses;
- Aggressive physical and occupational therapy totaling at least 7–10 hours per week, as previously prescribed;
- Two-person assistance for all mobility and activities of daily living;
- Infection-control protocols meeting state and federal standards.

b. Coordinate with Plaintiff's chosen representative to ensure **Plaintiff's active participation** in all discharge planning and placement decisions.

c. Provide Plaintiff and his representative with a **written discharge plan** at least 24 hours prior to any future transfer or discharge, identifying the receiving facility, clinical capabilities, attending physician, and continuity-of-care plan.

d. Comply fully with **Livanta QIO's October 8, 2025 determination** finding the October 6 , 2025 discharge unsafe and requiring corrective action.

**2. Enforcement of OPM's August 18, 2023 Final Decision**

**ORDER Blue Cross Blue Shield Association (BCBSA), including its California administrator Blue Shield of California (FEP), within 24 hours to:**
a. **Implement and honor the U.S. Office of Personnel Management's Final Agency Decision** dated **August 18, 2023 (Control No. Y23173003)** authorizing Long-Term Acute Care (LTAC) hospitalization for Plaintiff;

b. **Authorize and pre-certify LTAC benefits** for admission to **an LTAC Hospital** with capacity to provide long term acute hospital-level care, complex wound management, IV therapy through a central port, and continuous physician oversight;

c. Provide **written confirmation of LTAC authorization** to Plaintiff, and this Court;

d. File a **status report within five (5) days** confirming compliance with OPM's directive and steps taken to identify a qualifying facility.

**3. Correction of Discriminatory and Derogatory Medical Record Characterizations**

**ORDER Defendants the** Regents of the University of California**, and all other hospital provider defendants to:**

a. Identify all medical-record entries, progress notes, or referral documents containing non-clinical, stigmatizing, or derogatory labels describing Plaintiff as "non-compliant," "difficult," "hospital hopper," or similar language;

b. Within **72 hours**, append to each such entry a **clarifying addendum** stating:

> "This notation does not reflect patient misconduct. It relates to medically documented disability-related needs requiring specialized care. Plaintiff's advocacy for safe treatment and continuity of care is consistent with his medical condition and protected under federal law."

c. Transmit corrected records and addenda to every facility, insurer, and case-management vendor that received the uncorrected version.

d. Refrain from including any similar non-clinical, stigmatizing, or retaliatory language in future medical records, discharge summaries, or referrals concerning Plaintiff.

**4. Plaintiff's Right to Participate in All Future Discharge Planning**

**ORDER** Defendants the Regents, and any successor facility to:

a. Recognize Plaintiff's right under 42 C.F.R. § 482.43 and 42 C.F.R. § 483.10 to participate fully in the development, review, and revision of his discharge and care-transition plans;

b. Provide Plaintiff and his representative **written notice of any proposed discharge or transfer** at least 72 hours in advance, including specific clinical justification and destination information;

c. Obtain Plaintiff's written acknowledgment of the discharge plan before implementation; and

d. Maintain ongoing communication with Plaintiff and Plaintiff's designated representative throughout placement and post-discharge care.

**5. Non-Retaliation**

**ORDER** all Defendants, their agents, employees, and contractors to refrain from any form of retaliation or adverse treatment arising from Plaintiff's exercise of rights under federal or state law, including:

a. Threatening discharge or transfer for asserting legal rights;
b. Denying, delaying, or reducing medically necessary care;
c. Creating or disseminating additional stigmatizing notations in records or communications.

**6. Monitoring and Status Conference**

**ORDER** all Defendants to appear at a **status conference within 72 hours** of this Court's Order to report:

- Plaintiff's current medical condition and placement;
- Regents' compliance with safe-placement directives;
- BCBSA's compliance with OPM's LTAC authorization; and
- Any obstacles to full compliance and continuity of care.

Plaintiff respectfully requests this Court set an **Order to Show Cause hearing within fourteen (14) days** to determine whether to convert this TRO into a Preliminary Injunction.

**7. Bond**

Plaintiff respectfully requests that the Court **waive or set bond at $100** pursuant to Fed. R. Civ. P. 65(c). Plaintiff seeks only enforcement of existing federal obligations, not imposition of new burdens; due to the high costs of Plaintiff's care needs he is incapable of posting a substantial bond; Defendants suffer no harm from compliance; and the public interest in protecting a medically fragile individual outweighs any financial considerations. *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009).

# V. <u>CONCLUSION</u>

Absent immediate intervention, Plaintiff faces imminent, irreparable harm—including sepsis, progressive disability, and death. The requested injunction simply enforces the care and protections federal law already guarantees.


Respectfully submitted,

DATED: October 20, 2025

<u>/s/</u> Rhonda Lunsford
Rhonda Lunsford, Esq.

1    Rhonda Lunsford, SBN 219239
     P.O. Box 31
2    San Leandro, CA 94577
     Telephone:(510) 759-9529
3    rrlunsford@hotmail.com

4    Attorney For Plaintiff

5

6                    UNITED STATES DISTRICT COURT

7                  NORTHERN DISTRICT OF CALIFORNIA

8                      SAN FRANCISCO DIVISION

9

10   JOHN DOE                              ) Case No.: 24-CV-02371-RFL
                                           )           24-CV-09469-RFL
11              Plaintiff,                  )           25-CV-02930-RFL
                                           )
12        vs.                              )
                                           )
13                                         )
     U.S. OFFICE OF PERSONNEL              ) **DECLARATION IN SUPPORT OF EX**
14   MANAGEMENT and DOES 1-10, inclusive.  ) **PARTE APPLICATION FOR**
                                           ) **INJUNCTIVE AND DECLARATORY**
15              Defendants.                ) **RELIEF**
                                           )
16   JOHN DOE                              )
                                           )
17              Plaintiff,                 )
                                           )
18        vs.                              )
                                           )
19                                         )
                                           )
20   THE REGENTS OF THE UNIVERSITY OF      )
     CALIFORNIA AND ROYAL AMBULANCE        )
21                                         )
                Defendants.                )
22                                         )
     JOHN DOE                              )
23                                         )
                Plaintiff,                 )
24                                         )
          vs.                              )
25                                         )
     OFFICE OF PERSONNEL MANAGEMENT,       )
26   and BLUE CROSS BLUE SHIELD            )
     ASSOCIATION, UNIVERSITY OF            )
27   CALIFORNIA SAN FRANCISCO              )
     MEDICAL CENTER, SUTTER EDEN           )
28   MEDICAL CENTER, ALAMEDA HEALTH        )
     SYSTEM, DR. YOUSSEF E. YOUSSEF,       )
     VERONICA PERAZA, HYUNJI AHN,          )
     SARA DULL and DOES 1-10, inclusive    )
                                           )
                                           )

                                -1-
                              DECLARATION

I, Rhonda R. Lunsford, Esq., declare as follows:

1.  I am counsel of record for **Plaintiff JOHN DOE** in the above-entitled action. I am admitted to practice before this Court and have personal knowledge of the facts stated herein. I submit this declaration pursuant to **Federal Rule of Civil Procedure 65(b)(1)(B)** in support of Plaintiff's **Ex Parte Application for Temporary Restraining Order and Preliminary Injunction.**

2.  Plaintiff's condition is medically critical. He has been without intravenous immunoglobulin (IVIG) infusions for more than seven days, is completely immunocompromised, and is confined in a facility lacking qualified nursing or physician oversight. Each day of delay significantly increases the risk of sepsis and death. Because of this ongoing emergency, immediate judicial intervention is required.

3.  On October 14, 2025, and October 18, 2025,  I provided **electronic** notice of Plaintiff's intent to seek emergency injunctive relief to counsel for all known Defendants as follows:

    a. **United States Office of Personnel Management (OPM):**

    Notice provided via email to Jevechius Bernardoni at the U.S. Attorney's Office, Civil Division, Northern District of California at jevechius.bernardoni@usdoj.gov on October 14, 2025, at 10:30 p. m.  and on October 18, 2025, at 9:15p.m.

    b. **The Regents of the University of California (sued as Regents):**

    Notice provided via email to Jonathan E. Chernoguz and Corinna E. Meissner at the Office of the General Counsel, University of California, 1111 Franklin Street, Oakland, CA 94607, JEC@hassard.com and cem@hassard.com on October 14, 2025, at 10:30 p. m.  and on October 18, 2025, at 9:15p.m.

    c. **Blue Cross Blue Shield Association (BCBSA):**

    Notice provided via email to Garner K. Weng counsel for BCBSA,

gweng@hansonbridgett.com on October 14, 2025, at 10:30 p. m.  and on October 18, 2025, at 9:15p.m.

d. **Eden Medical Center**

Notice provided via email to Aaron Schultz at aschultz@jsupplelaw.com on October 14, 2025, at 10:30 p. m.  and on October 18, 2025, at 9:15p.m.

e. Alameda Health System

Notice provided via email to Patrick C. Stokes at pstokes@hinshaw-law.com on October 14, 2025, at 10:30 p. m.  and on October 18, 2025, at 9:15p.m.

4.  Each email transmission was successfully delivered and did not generate any bounce-back or delivery failure notice. True and correct copies of the transmittal emails are available for filing if requested by the Court.

5.  Due to Plaintiff's critical medical condition and the immediate threat to his life, **a noticed motion schedule would result in irreparable harm before a hearing could be held.** The purpose of this ex parte application is to prevent that harm while allowing Defendants a prompt opportunity to respond at a subsequent hearing on the order to show cause for preliminary injunction.

6.  Accordingly, I certify that **reasonable and good-faith efforts have been made to give notice** of this application to all parties, and that **further delay to allow formal notice would likely result in irreparable injury or death** before the matter could be heard.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 20 October 2025, at Oakland, California.

*Rhonda Lunsford*
_____
Rhonda Lunsford
Attorney for Plaintiff

1  Rhonda Lunsford, SBN 219239
   P.O. Box 31
2  San Leandro, CA 94577
   Telephone:(510) 759-9529
3  rrlunsford@hotmail.com

4  Attorney For Plaintiff

5

6              **UNITED STATES DISTRICT COURT**

7             **NORTHERN DISTRICT OF CALIFORNIA**

8                **SAN FRANCISCO DIVISION**

9

10  JOHN DOE                           ) Case No.: 24-CV-02371-RFL
                                       )          24-CV-09469-RFL
11          Plaintiff,                 )          25-CV-02930-RFL
                                       )
12     vs.                             )
                                       )
13  U.S. OFFICE OF PERSONNEL           ) **PLAINTIFF'S DECLARATION IN**
    MANAGEMENT and DOES 1-10, inclusive.) **SUPPORT OF EX PARTE APPLICATION**
14          Defendants.                ) **FOR INJUNCTIVE AND**
                                       ) **DECLARATORY RELIEF**
15  JOHN DOE                           )
                                       )
16          Plaintiff,                 )
                                       )
17     vs.                             )
                                       )
18                                     )
    THE REGENTS OF THE UNIVERSITY OF   )
19  CALIFORNIA AND ROYAL AMBULANCE     )
                                       )
20          Defendants.                )
                                       )
21  JOHN DOE                           )
                                       )
22          Plaintiff,                 )
                                       )
23     vs.                             )
    OFFICE OF PERSONNEL MANAGEMENT,    )
24  and BLUE CROSS BLUE SHIELD         )
    ASSOCIATION, UNIVERSITY OF         )
25  CALIFORNIA SAN FRANCISCO           )
    MEDICAL CENTER, SUTTER EDEN        )
26  MEDICAL CENTER, ALAMEDA HEALTH     )
    SYSTEM, DR. YOUSSEF E. YOUSSEF,    )
27  VERONICA PERAZA, HYUNJI AHN,       )
    SARA DULL and DOES 1-10, inclusive )
28                                     )
                                       )

                      -1-
              PLAINTIFF'S DECLARATION

**TO THE HONORABLE COURT:**

I, JOHN DOE, declare as follows:

I am over the age of eighteen and competent to make this declaration. I make this declaration based on my personal knowledge, and if called as a witness, I could and would testify competently to the following facts.

## I.    MY MEDICAL CONDITIONS AND WHY I NEED A PORT

1.  I suffer from multiple rare and potentially life-threatening medical conditions including scleroderma with dermatomyositis overlap, immunodeficiency, calcinosis cutis (50% mortality if untreated), severe vascular disease, and post-stem cell transplant complications.

2.  These conditions require life-sustaining intravenous treatments: (a) IVIG infusions every two weeks to maintain immune function, and (b) sodium thiosulfate infusions three times per week to control calcinosis cutis. Missing infusion therapy causes rapid deterioration, extreme fatigue, and high risk of death.

3.  My veins are severely damaged and cannot support repeated peripheral IV placement. In 2020, after multiple failed peripheral access attempts caused severe pain and complications, my physicians placed a central port in my chest to provide permanent, safe vascular access.

4.  Port access requires specialized training because improper technique can cause life-threatening infections, blood clots, or permanent loss of the port. Only qualified registered nurses should access my port.

## II.    MY PRIOR HOSPITALIZATIONS AND UNSAFE DISCHARGES

5.  I have been hospitalized multiple times due to my complex medical conditions. During prior hospitalizations I received intensive, effective physical therapy and occupational

therapy that significantly improved my strength, mobility, and function. I have previously received daily or near daily physical therapy per week, 45 minutes to one hour per session. The therapy was challenging and comprehensive, including: walking laps with progressively increasing difficulty; while standing at walker, tapping small cones placed strategically with both feet; side steps and backward walking; navigating around cones while walking; wall or door squats with pillow behind back, with and without walker support; prolonged squats and other strengthening exercises; timed laps to build endurance; in-bed exercises including side-lying with leg elevated on Hoyer lift doing hip rotation exercises to promote hip movement; flexion and gravity exercises. As a result, I experienced better stamina, more endurance, greater flexibility, joints felt looser and less stiff, and consistent progress.

6.  I have also previously received occupational therapy that was equally intensive: manual or passive ranging of upper extremities with resistance; hitting targets for coordination; sitting at edge of bed for 30 minutes during meals for trunk strength; head, neck, and shoulder exercises both assisted and unassisted; TheraBand resistance exercises. This therapy maintained my upper body function and ability to perform activities of daily living.

7.  UC Davis Medical Center did not provide this level of therapy during my six-month hospitalization in 2025. When UC Davis discharged me to Integrity Care Group, they knew I required aggressive physical and occupational therapy to prevent further deterioration and maintain the progress I had made.

## III.    THE PRESSURE ULCER THAT DEVELOPED AT UC DAVIS

8.  During my final weeks at UC Davis, I developed an open pressure ulcer on my coccyx due to inadequate wound care. UC Davis's wound care team acknowledged this pressure ulcer. Despite this recent development of a serious wound requiring intensive

management, UC Davis proceeded with discharge planning rather than ensuring the ulcer was stabilized and healing.

9.  This pressure ulcer was a hospital-acquired condition—something that developed while I was under UC Davis's direct care and supervision. Under Medicare regulations, hospitals are penalized for allowing preventable hospital-acquired conditions like pressure ulcers to develop. Yet UC Davis's response was not to ensure proper healing and prevent further deterioration, but to discharge me to a facility they knew could not provide the specialized wound care this ulcer required.

## IV.    OCTOBER 6, 2025 - THE DISCHARGE DAY

10. On the morning of October 6, 2025, RN Case Manager Francis Koon entered my room and announced that I had "lost my appeal" and would be discharged at 3:00 PM that day. Koon's statement was incorrect—my representative had just filed a QIO reconsideration request that morning, which was still pending. Koon spoke in a matter-of-fact tone and acted as if the discharge was final and non-negotiable.

11. Approximately one hour later, my attending physician Dr. Brittany Bartolome entered my room and said I "may not be leaving today" because there was a "second appeal pending" and she needed to "tie up some infusions." Dr. Bartolome specifically confirmed to me that she and the hospital had been notified of the pending QIO reconsideration that had been filed that morning and that she needed to coordinate with the appeals process before I could be discharged.

12. When I told Dr. Bartolome that Francis had already announced my discharge, Dr. Bartolome appeared confused and asked, "Francis Koon?" She said they had discussed the second appeal in their morning meeting and that she would talk to Francis and the nurse Amber to clarify the situation. Dr. Bartolome seemed genuinely surprised and uncertain about whether I would be discharged.

13. Despite Dr. Bartolome's uncertainty, despite her personal knowledge that the hospital had been notified of the pending QIO reconsideration, and despite the fact that an independent physician reviewer was actively evaluating whether the discharge was medically appropriate, UC Davis discharged me at 3:00 PM that same day. UC Davis discharged me knowing that a federal quality review organization would likely find the discharge inappropriate—which is exactly what happened when Livanta issued its determination on October 8. The administrative pressure to discharge me overrode the medical team's judgment and the pending federal review.

14. UC Davis sent me to Integrity with my port already accessed from the hospital. This was a deliberate temporary workaround that masked Integrity's lack of qualified staff and allowed UC Davis to complete the discharge despite knowing Integrity could not safely care for me. Because my port was pre-accessed, Integrity could initially give me some infusions without having to access the port themselves. UC Davis knew this pre-accessed port would only last 7 days before it would need to be de-accessed and re-accessed—which would require port-qualified nurses that Integrity did not have. By sending me with a pre-accessed port, UC Davis created the illusion of a safe discharge while knowing I would face a medical crisis within days once the temporary access expired and Integrity's lack of qualified staff was exposed.

15. UC Davis's unsafe discharge to Integrity on October 6 was not an isolated incident but part of a months-long pattern of attempting to discharge me anywhere, regardless of safety. Between April and August 2025, while I was hospitalized at UC Davis, their discharge planners repeatedly referred me to non-medical board-and-care homes that are legally prohibited from admitting patients with my medical needs. For example, UC Davis referred me to Brilliant Care Home in Roseville, California—a facility that cannot legally admit patients requiring IV infusions and that had a resident death under

investigation by police in 2024. During this period, multiple board-and-care facilities came to the hospital to evaluate me for admission, even though I require 24-hour skilled nursing, port access for IV infusions, complex wound care, and continuous medical supervision—services board-and-care homes are not licensed to provide. I have reviewed my medical records from UC Davis and found that they documented this pattern by blaming me rather than acknowledging their own failures. UC Davis records state: "Overall, his chronic wounds, complex chronic autoimmune conditions, and other financial logistical barriers have resulted in multiple prolonged hospitalizations with difficulty finding placement, and patient and his spouse unwilling to accept certain facilities and/or dispositions." This characterization is false and offensive. I have never refused appropriate placement. I have refused only unsafe discharges to facilities—like board-and-care homes and Integrity—that lack qualified staff or adequate services to keep me alive. The real barriers are Blue Shield's refusal to comply with OPM's federal order authorizing LTAC and UC Davis's failure to arrange safe discharge, not my supposed "unwillingness." This pattern demonstrates that UC Davis has been trying for months to discharge me to any facility willing to accept me, regardless of safety or appropriateness, and then falsely blaming me in medical records when I object to unsafe placements.

16. UC Davis discharged me to Integrity Care Group despite knowing it was unsafe. My representative obtained public records from the California Department of Public Health (available at

https://www.cdph.ca.gov/Programs/CHCQ/LCP/CalHealthFind/Pages/SearchResult.aspx) documenting Integrity's extensive regulatory violations from 2022 through 2025. These records show 79 documented complaints and incidents resulting in 54 deficiency citations and one state enforcement action by CDPH. My representative reviewed these

records and informed me that the deficiencies include multiple violations directly relevant to my needs, including: medication administration errors, failure to provide adequate nursing care, inadequate wound care, failure to follow physician orders, inadequate staffing levels, and failure to ensure patient safety. These are the exact services I require and the exact failures I have now experienced at Integrity. The pattern of violations and necessity for state enforcement demonstrates that Integrity has a systemic inability to provide safe care. UC Davis knew I required continuous skilled nursing, daily complex wound care, port-qualified RNs for my twice-monthly IVIG infusions, and aggressive rehabilitation therapy.

17. My representative sent correspondence to UC Davis on September 30, 2025, documenting specific warnings about Integrity's violations and identifying safer alternative facilities. Despite these documented warnings, UC Davis discharged me to Integrity on October 6, 2025.

18. I wanted safe placement at a facility with qualified staff. At my direction, my representative researched appropriate facilities and identified Pinnacle Transitional Care in Duarte, CA as a safe option that could meet my medical needs. My representative proposed Pinnacle to UC Davis discharge planners on my behalf. My representative informed me that Pinnacle's public CDPH records show it does not have the extensive complaints, deficiency citations, or state enforcement actions that Integrity has. However, UC Davis refused to arrange a placement to Pinnacle and would only discharge me to Integrity, despite knowing Integrity was unsafe and despite having a safe alternative with a clean regulatory record available. This refusal demonstrates that UC Davis's goal was simply to get me out of the hospital as quickly as possible, not to arrange safe placement as required by federal law.

19. On August 18, 2023, the U.S. Office of Personnel Management (OPM) issued a Final Decision finding that Blue Cross Blue Shield improperly denied my LTAC benefits and ordering Blue Shield to authorize LTAC coverage (Control No. Y23173003). I received a copy of this binding federal order. Despite this order, Blue Shield has continued to refuse LTAC authorization for over two years. Had Blue Shield complied with the OPM order, I would have been placed in an appropriate LTAC facility where I would have received the appropriate care and therapy that would have allowed me to achieve independence so that I could have transitioned to home instead of here struggling to survive at Integrity. A true and correct copy of the OPM Final Decision is attached as **Exhibit A**.

20. I have been discharged unsafely before. UCSF discharged me to an LTAC in Arizona that could not accommodate my care needs. UCLA Ronald Reagan Medical Center discharged me to a skilled nursing facility that was unable to provide infusions or port care and I had to be transferred back to the hospital for infusions.

21. I appealed UC Davis's October 6, 2025, discharge decision to Livanta, the federal Quality Improvement Organization (QIO). On October 8, 2025, Livanta issued a verbal determination (with written confirmation received on October 14) finding that UC Davis's discharge was inappropriate. I received a copy of this written QIO determination. This federal agency validated my concerns that the discharge was unsafe. A true and correct copy of the Livanta QIO written determination is attached as **Exhibit B**.

## V.    WHAT HAPPENED ON OCTOBER 6 AT INTEGRITY

22. On October 6, 2025, UC Davis transferred me to Integrity Care Group against my will and despite my pending QIO appeal.

23. Shortly upon arrival problems began to surface. I soon realized I was not in a facility that can provide the care I need to improve my condition, or at a minimum, prevent progression of my disability.

24. That evening, three different Licensed Vocational Nurses (LVN's), including the Assistant Director of Nursing and the Charge Nurse, presented me with two consent forms: (a) a "Consent to Treat" form that would have designated Integrity's physician as my Primary Care Physician and included a broad waiver of facility liability; and (b) an "Informed Consent for Restraints" form authorizing chemical and physical restraints. They told me I could not receive any medications or wound care until I signed both forms. The Assistant Director of Nursing and the Charge Nurse returned to my room repeatedly, insisting that I sign, and I felt pressured and intimidated. I refused to sign either form because doing so would have overridden my established physicians and my right to refuse unnecessary restraints. After I declined, Integrity withheld my medications and wound care for more than 24 hours. True and correct copies of these forms are attached as **Exhibit C**.

25. After I refused to sign, Integrity withheld my medications and wound care. I had received wound care at UC Davis on October 6 before discharge, but Integrity refused to provide wound care on October 7 because I would not sign their forms. My medications were also withheld until the evening of October 7. I went 24 hours without wound care and over 36 hours without medications while my representative negotiated with Integrity leadership.

26. On the morning of October 7, Integrity's Medical Director Dr. Veerapa met with me and my representative. Dr. Veerapa agreed that I could keep my Primary Care Physician and that he would facilitate my care while at the facility. He specifically promised that any changes to my medication regimen or treatment plan would be

discussed with me first, and that he would collaborate with my treating physicians when needed. He also stated he had a physician assistant who made rounds at the facility when he was unavailable. To date, I have not seen the physician assistant and Dr. Veerapa has not been back. That same afternoon, my representative received a call from Integrity's COO Michelle King and owner Mohammad Kakar in which King threatened to discharge me to a local hospital if we did not agree to their physician requirements. My representative informed me of this threat. Later that afternoon, Kakar called my representative back and stated that Dr. Veerapa would agree to the arrangement we had already discussed that morning. I received some medications on the evening of October 7, but wound care did not begin until October 8—a full 48 hours after my last wound care at UC Davis.

**VI.    THE SERIOUS PROBLEMS AND ISSUES AT INTEGRITY: NO QUALIFIED NURSES, NO DOCTOR, WORSENING WOUNDS**

27. Despite Dr. Veerapa's specific promises, Dr. Veerapa has provided no follow-up examinations, no assessment of my rapidly deteriorating wounds, no response to my missed infusions, or medication errors. For 12 days (October 8-19), I have had zero physician oversight despite my catastrophic medical decline and despite having a physician assistant available.

28. On or about October 8, Integrity's Director of Nursing (RN Remy) admitted to me and my representative that she had not accessed a port in over a year and a half and would need to "watch a video" to remember how. I refused to allow her to access my port because of the serious risk of infection, blood clots, and permanent loss of my only vascular access.

29. Integrity later claimed to my representative to have a nurse practitioner who had been "walked through" the port access procedure by telephone by the infusion supply

company (MidValley Health Services). Being instructed by phone is not adequate training for safe port access. I did not consent to allow inadequately trained staff to access my port.

30. My port requires daily flushing when accessed to prevent clots and infection, as every hospital I have been in since 2020 has consistently done. At Integrity, it has only been flushed four times since my admission on October 6, 2025. This is far below safe standards of care. Each missed flush increases the risk of clotting, infection, or permanent loss of my only port, which would make it impossible for me to receive any further IVIG or sodium thiosulfate infusions.

31. My wounds have gotten dramatically worse at Integrity. When I arrived on October 6, I had a significant pressure ulcer on my coccyx (tailbone) that was being managed at UC Davis. At Integrity, this wound has deteriorated catastrophically.

32. As of October 19, 2025, my coccyx ulcer is now actively bleeding, indicating deep tissue damage and complete failure of basic wound care. The bleeding demonstrates that I am at immediate risk of life-threatening infection and sepsis. I can see and feel the wound getting worse every day. I personally took photographs of my wounds on October 8 and October 19, 2025, with assistance from my representative, to document their deterioration. These photographs accurately show the condition of my wounds as they appeared on those dates. A true and correct copy of these wound photographs is attached as **Exhibit D**.

33. In addition to my worsening coccyx ulcer, I have developed new wounds on my buttocks that were not present at UC Davis. These new wounds developed because Integrity lacks the staffing to provide frequent turning and repositioning.

34. Integrity's wound care failures are compounded by complete lack of consistency and professional oversight. Since my admission on October 6, five different people have

performed my wound care. Most are LVNs (Licensed Vocational Nurses), but on at least one occasion, a CNA (Certified Nursing Assistant) performed most of the work. CNAs are not qualified to perform complex wound care on deep pressure ulcers requiring topical medications. There has been no RN oversight and no wound care specialist has assessed my wounds despite their obvious deterioration. Because Integrity provides no standardized training or protocols, I am forced to teach each new nurse how to apply my topical medications and perform my wound care safely. This takes hours and drains my energy when I am already severely weakened. This lack of continuity and professional oversight increases my infection risk dramatically and violates all accepted wound care standards. No wonder my wounds are getting worse instead of better.

35. By October 15, 2025, my port had been accessed for nine days—beyond safe limits for continuous access. I was forced to have an inexperienced nurse de-access my port on October 15. Since then, no one at Integrity can re-access it safely. Without port access, I cannot receive my life-sustaining IVIG or sodium thiosulfate infusions.

36. I missed my October 14, 2025, IVIG infusion. As of today, October 20, I am seven days overdue. IVIG must be administered every two weeks. Without it, my immune system is compromised and I am at extreme risk of life-threatening infections and sepsis. I can feel my body weakening without the IVIG.

37. I require sodium thiosulfate infusions three times per week to control my calcinosis cutis. When I first arrived at Integrity on October 6, my port was already accessed from UC Davis, so the Director of Nursing (RN Remy) was able to provide sodium thiosulfate infusions through the existing access. However, after my port was de-accessed on October 15, no one at Integrity has been able to safely re-access it. Since

October 15, I have missed sodium thiosulfate infusions. Missing these infusions causes calcium deposits to form in my soft tissues, causing extreme pain and tissue damage.

38. Integrity claims to provide physical therapy, but what I receive is completely inadequate compared to what I need and what has been ordered. At Integrity, therapy consists only of getting me up to walk a few laps for approximately 30 minutes per session. There are no challenging exercises, no strengthening work, no cone exercises, no squats, no resistance training, no timed laps, no in-bed exercises, no hip rotation work—no intensive, comprehensive therapy that has produced results in the past.

39. This minimal, low-quality therapy is causing me to regress. My stamina is declining, my joints are becoming stiffer, my flexibility is decreasing, and my strength is deteriorating. I need aggressive, comprehensive physical and occupational therapy as ordered by my physicians to maintain and improve function, not token "walks around the room."

40. My pain has become more elevated than it was at UC Davis—everywhere in my body, but even higher in my coccyx, buttocks, and back area where my pressure ulcer and wounds are located. After I was admitted on October 6, I learned that Integrity had not secured insurance authorization for my pain medication regimen. My pain medications were changed without my knowledge or consent. The current pain management is inadequate. The pain continues to worsen as my wounds deteriorate. In addition, I am experiencing complications from changes to my pain medication regimen. After I was discharged to Integrity on October 6, I learned that Integrity had not secured insurance authorization for a medication I require to manage complications from my pain medicine. This medication was part of my established treatment regimen, but without prior insurance authorization, Integrity cannot provide it.

41. Integrity's medication management has been dangerously inadequate throughout my stay. One of my essential autoimmune medications, an immunosuppressant, was delivered to Integrity on or about September 30, 2025—before I was even admitted on October 6. However, Integrity did not know the medication had been delivered until after I contacted the pharmacist to inquire about the status. The medication was not administered until October 17, 2025—eleven days after my admission. This immunosuppressant is critical for controlling my autoimmune conditions and missing it for nearly two weeks put me at risk of serious disease flare and organ damage.

42. In addition to the immunosuppressant failure, there have been numerous occasions when nurses have brought my pills but medications were missing from the cup. I have had to ask nurses multiple times to recheck and provide the missing pills. This pattern of medication errors demonstrates that Integrity lacks adequate systems to ensure patients receive their prescribed medications correctly and on time. I was also being administered Miralax three times daily instead of once daily as prescribed. On October 19, 2025, my representative asked an LVN about the dosing and the LVN acknowledged the error and changed the order but could not explain why the incorrect dosing had been ordered or administered. Lastly, I have one medication that requires fasting and sitting up for thirty minutes to prevent esophageal irritation or damage. When I asked about the status of the medication, I was told that I had already received the medication; it had been administered with food and other medications.

43. Since my admission on October 6, 2025, I have repeatedly requested basic hygiene supplies including mouthwash, wipes for self-cleaning, toothpaste, and a urinal. Staff have told me they were out of specific items. Without cleaning wipes, I cannot maintain basic hygiene after toileting, which increases my infection risk. The lack of

even basic hygiene supplies demonstrates that Integrity is unprepared to provide even the most fundamental care for residents.

44. I am 6'7" tall and require an 88-inch low-air-loss hospital bed that can elevate to 30 inches for sit to stand transfers. Integrity has provided me with an 84-inch bed.  This inadequate bed contributes to my worsening pressure ulcer and wounds because I cannot maintain proper positioning and the bed does not provide adequate pressure redistribution.

45. There are residents experiencing behavioral issues and outbursts that create a chaotic and unsafe environment inappropriate for a vulnerable dependent adult requiring specialized medical care. I have personally witnessed residents screaming and residents have opened the door to my room, thinking it's a bathroom, without staff intervention. I am in bed and unable to defend myself. This chaos diverts staff attention away from my complex medical needs and has left me feeling unsafe. I require a quiet, controlled medical environment where staff can focus on preventing life-threatening complications, not managing psychiatric crises.

## VII.    I AM TERRIFIED AND FEAR MY TIME AT INTEGRITY WILL NOT END WELL

46. I am terrified. I can feel my body deteriorating. My wounds are bleeding. I have missed my life-sustaining IVIG infusion. No doctor has examined me in 12 days despite my declining condition. My pain is worse than it was at UC Davis. My body is weakening every day.

47. I believe I will die if I remain at Integrity Care Group. They do not have qualified nurses to access my port. They cannot provide the intensive therapy I need. They have no physician oversight. My wounds are getting worse, not better. I am immunocompromised without my IVIG and at extreme risk of sepsis.

48. I appealed UC Davis's discharge because I knew it was unsafe. Livanta agreed with me—the federal QIO found that UC Davis should not have discharged me to Integrity. Yet I remain here, deteriorating, while UC Davis refuses to comply with the federal order to find me safe placement.

49. I need emergency court intervention to save my life. I need to be transferred immediately to a facility with port-qualified registered nurses who can safely access my port and administer my IVIG and sodium thiosulfate infusions. I need intensive, comprehensive physical and occupational therapy. I need daily physician oversight by doctors who understand my complex conditions. I need proper wound care to stop the bleeding and prevent infection. I need adequate pain management.

50. Blue Cross Blue Shield must be ordered to comply with OPM's August 2023 order authorizing LTAC benefits so I can be placed in an appropriate facility with hospital-level skilled nursing and continuous medical supervision.

51. I am asking this Court to save my life by ordering UC Davis to arrange safe placement immediately and ordering Blue Shield to authorize the LTAC benefits I am entitled to under federal law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 20th day of October, 2025, at Manteca, California.

*JOHN DOE*
_____
JOHN DOE

# EXHIBIT A



**UNITED STATES OFFICE OF PERSONNEL MANAGEMENT**
Washington, DC 20415

Healthcare and
Insurance

August 18, 2023

████████████████
██████████████████
█████████████████

██████████████████          Enrollee ID:RXXXXX714

███████████████ :

We have completed our review of the health benefits dispute (Y23173003) with Blue Cross and Blue Shield.  The Plan denied a precertification request for long-term acute care hospital as not medically necessary.  The precertification was requested for care at Kentfield Hospital from December 2022 through the date of discharge, for ████████████████

Our Physician Consultant reviewed the documentation submitted in support of the appeal and determined that the long-term acute care hospital is medically necessary for ██████reported condition.  Therefore, we have directed the Plan to provide appropriate benefits for the service in question. If you have any questions, you may contact the Plan directly.

We appreciate your patience during our review period. Thank you for your inquiry and cooperation in this matter.

Sincerely,

*Renata Fries*

Renata Fries
Legal Administrative Specialist
Federal Employee Insurance Operations
202-606-1067

# EXHIBIT B

**Quality Improvement Organizations**
Sharing Knowledge. Improving Health Care.
CENTERS FOR MEDICARE & MEDICAID SERVICES

**commence** *health*

## BFCC-QIO DETERMINATION LETTER

October 8, 2025

**Case:**
**Patient Name:**                                    **Date of Birth:**
**Provider:**          University of California Davis Medical Center
**Service Date:**      March 8, 2025                 **Medicare(HIC)#:**

Dear

Thank you for your patience while we completed a thorough review of your provider's decision to end services. We understand the appeal process can be stressful. We hope your experience with Commence Health (formerly Livanta LLC) has been a positive one.

Commence Health is authorized by Medicare to review medical care and services to decide if medical services meet professionally recognized standards of health care, are medically necessary, and are delivered in the most appropriate setting. Commence Health is also mandated to conduct an expedited review when a beneficiary appeals a provider's decision to end Medicare covered services.

Based on a request for a reconsideration appeal, an independent, certified, licensed, practicing peer reviewer reviewed the provider's decision to end coverage for the medical services from University of California Davis Medical Center.   It was determined that you require the continued services being provided by University of California Davis Medical Center. In making the determination, the peer reviewer offered the following comments:

*A review of the medical records received shows that the patient was admitted to the Hospital for management of chronic wounds with calcinosis cutis. The patient received treatment included* ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *The patient is cleared for discharge, but placement is taking longer than expected. Vital signs and laboratory reports show no critical findings. No conditions require further hospital care. Additional treatment can occur in a different setting. For discharge planning, multiple Skilled Nursing Facilities (SNFs) were contacted, but declined due to complex wound needs and* ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *requirements. A safe discharge location is still needed and must be arranged.*

We are recommending that Medicare make payment for continued medical services. You are responsible only for payment of applicable deductible, coinsurance, or any convenience services or items normally not covered by Medicare. If you have paid University of California Davis Medical Center for any services other than those mentioned based on the Notice of Medicare of Non-Coverage, arrangements can be made for a refund. Please call Commence Health at 877-588-1123, and request contact information for the Medicare Administrative Contractor (MAC) that serves University of California Davis Medical Center. Written request for payment refunds must be made within six (6) months of the date of this notice.

The Medicare Administrative Contractor must be provided with the following documents:

1.  A copy of this notice

2.  A copy of the bill for the services

3.  A payment receipt or any other evidence (e.g., canceled check) showing payment for the denied services

If you have any questions regarding this action please call Commence Health at 877-588-1123.

Sincerely,

Matthew Stofferahn, MD
Medical Director

The Commence Health Medical Director signs all letters to maintain physician reviewer anonymity.

| **Information and questions about quality of care or appeals.** | **Complaints or concerns about Commence Health's work?** |
|---|---|
| Contact Commence Health at 877-588-1123 | Let CMS know at BFCCQIOConcerns@cms.hhs.gov |

cc: University of California Davis Medical Center
    Medicare Administrative Contractor/Fiscal Intermediary

Confidentiality: This document is intended for the addressed recipient only and may contain confidential information. It is unlawful under 42 U.S.C.§ 1320c-9 to redisclose information in this document except as permitted under 42 U.S.C.§ 1320c-9 and 42 CFR § 480 et seq. If you are not the intended recipient, you are notified that the disclosure, copying, distribution, or retention of the contents of this information is strictly prohibited and could be in violation of a patient's privacy rights and federal law. If you are not the intended recipient, please notify the sender, then delete and destroy all copies.

# EXHIBIT C

# INFORMED CONSENT

THIS DOCUMENTATION IS TO BE COMPLETED BEFORE TREATMENT IS INITIATED WITH CHEMICAL RESTRAIN, PHYSICAL RESTRAINTS, PSYCHO THERAPEUTIC DRUG, OR THE PROLONGED USE OF A DEVICE THAT MAY LEAD TO THE INABILITY OF A RESIDENT TO REGAIN USE OF A NORMAL BODILY FUNCTION.

*INFORMED CONSENT SHALL NOT BE REQUIRED FOR ROUTINE CARE OR EACH TIME A TREATMENT OR PROCEDURE IS ADMINISTERED UNLESS MATERIAL CIRCUMSTANCES CHANGE.*

RESIDENT NAME: ▮▮▮▮▮▮▮▮▮▮                            PHYSICIAN:

PROPOSED TREATMENT:

REASON FOR TREATMENT (why this treatment is recommended):

**THIS AREA MUST BE COMPLETED IN FULL BY THE PHYSICIAN WHEN THE RESIDENT/REPRESENTATIVE HAS NOT BEEN INFORMED OF RISKS**

☐  I HAVE NOT DISCLOSED THE RISKS RELATED TO THE RESTRAINT, PSYCHOTHERAPEUTIC DRUG, OR PROLONGED USE OF A DEVICE TO THE RESIDENT OR THE RESIDENT'S REPRESENTATIVE ON SECTION 72527 (a) OF THE CALIFORNIA ADMINISTRATIVE CODE, TITLE 22. DIVISION 5, CHAPTER 3. HOWEVER, I HAVE STILL PROVIDED OTHER MATERIAL INFORMATION LISTED BELOW.

THE RESIDENT/RESIDENT'S REPRESENTATION LISTED BELOW HAS GIVEN INFORMED CONSENT TO TREAT:
☐  YES
☐  NO (REASON) _____

**THIS AREA MUST BE COMPLETED IN FULL BY THE PHYSICIAN WHEN THE RESIDENT/REPRESENTATIVE HAS BEEN INFORMED OF RISKS**

THE RESIDENT THE FOLLOWING MATERIAL INFORMATION
  ASON FOR TREATMENT ···············  SES OF ILLNES

2.  NATURE OF PROCEDURES TO BE USED IN THE PROPOSED TREATMENT; INCLUDING PROBABLE AND DURATION.

3.  PROBABLE DEGREE & DURATION OF IMPROVEMENT OR REMISSION (TEMPORARY OR PERMANENT), EXPECTED WITH OR WITHOUT TREATMENT.

4.  NATURE, DEGREE, DURATION & PROBABILITY OF KNOW SIDE EFFECTS & SIGNIFICANT RISKS COMMONLY KNOWN BY HEALTH PROFESSIONALS.

5.  REASONABLE ALTERNATIVE TREATMENT AND RISKS AND WHY THE PARTICULAR TREATMENT IS RECOMMENDED.

6.  THAT THE RESIDENT HAS THE RIGHT TO ACCEPT OR REFUSE THE PROPOSED TREATMENT AND IF HE/SHE CONSENTS, HAS THE RIGHT TO REVOKE HIS/HER CONSENT FOR ANY REASON AT ANY TIME.

RESIDENT'S NAME: ▮▮▮▮▮▮▮▮▮▮

RESIDENT'S REPRESENTATIVE:                    RELATIONSHIP TO RESIDENT:

☒ RESIDENT
☐ RESIDNET'S REPRESENTATIVE          HAS GIVEN CONSENT TO THE ABOVE TREATMENT

SIGNATURE OF PHYSICIAN:                         DATE:
(Who obtained Informed Consent) ✗              10/6/25

**CONFIRMATION OF INFORMED CONSENT** (The facility staff to complete this section)

THE PHYSICIAN ABOVE HAS CONFIRMED THAT HE/SHE HAS GIVEN THIS INFORMATION TO THE RESIDENT AND/OR THE RESIDENT REPRESENTATIVE VIA:
☑ EL   NE
☐ FACSIMILE              THE PHYSICIAN WILL COMPLETE DOCUMENTATION AS SOON AS POSSIBLE

IF AN INTERPRETER WAS USED, COMPLETE THE FOLLOWING:
NAME OF INTERPRETER:

RELATIONSHIP TO RESIDENT:                  RELATIONSHIP TO FACILITY:

*RESIDENT SIGNATURE IS NOT REQUIRED ON THIS FORM*

SIGNATURE OF FACILITY REPRESENTATIVE:          TITLE:        DATE:
                                               LVN          10/6/25

005 Rev. 3/95

# CONSENT FOR MEDICAL TREATMENT

**FACILITY:** ███████████████████████

I, the undersigned, a resident in the above facility, authorize its staff members and consultants, to provide medical treatment while I am a resident in the facility.

I understand that this facility, its staff members and consultants, will not provide medical treatment that is not ordered by my personal physician, Dr.- ███████ specialty ███████████, telephone number ███████ whomever he or she may designate as his/her assistant, and the facility is not liable for any act or omission when following the instructions of said physicians.

I hereby certify that I have read and fully understand the above authorization for medical treatment.

I am aware of my right under law (California Administrative Code, Section 72527 of Title 22) to refuse any oral/or all medical treatment.

SIGNED: _____  DATE: 10/6/25

███████████████████████████████████

SIGNED: ████████████████████████████████

(Responsible Party/Agent)

FACILITY WITNESS: _____  DATE

_____        _____
(Signature/Title)                                        (Signature/Title)

ADMIT DATE: _____                TIME _____ AM/PM

| Resident Name ██████████████ | Room #: | Physician: DR. Veerappa |
|---|---|---|

094 Rev 6/99   ARTISTIC PRESS   (323) 660-3085

# EXHIBIT D

# LEFT BUTTOCK 10/8 & 10/19





# RIGHT BUTTOCK 10/8 & 10/19





# COCCYX 10/8 & 10/19





# Thighs (one photo) 10/8
# Right Thigh 10/19
# Left Thigh 10/19







1    Rhonda Lunsford, SBN 219239
     P.O. Box 31
2    San Leandro, CA 94577
     Telephone:(510) 759-9529
3    rrlunsford@hotmail.com

4    Attorney For Plaintiff

5

6                    **UNITED STATES DISTRICT COURT**

7                   **NORTHERN DISTRICT OF CALIFORNIA**

                         **SAN FRANCISCO DIVISION**
8

9
     JOHN DOE                              )  Case No.:  24-CV-02371-RFL
10                                         )             24-CV-09469-RFL
                    Plaintiff,             )             25-CV-02930-RFL
11                                         )
           vs.                             )
12                                         )  **[PROPOSED] ORDER**
                                           )
13   U.S. OFFICE OF PERSONNEL              )
     MANAGEMENT and DOES 1-10, inclusive.  )
14                  Defendants.            )
                                           )
15   JOHN DOE                              )
                                           )
16                  Plaintiff,             )
                                           )
17         vs.                             )
                                           )
18                                         )
     THE REGENTS OF THE UNIVERSITY OF      )
19   CALIFORNIA AND ROYAL AMBULANCE        )
                                           )
20                  Defendants.            )
                                           )
21   JOHN DOE                              )
                                           )
22                  Plaintiff,             )
                                           )
23         vs.                             )
     OFFICE OF PERSONNEL MANAGEMENT,       )
24   and BLUE CROSS BLUE SHIELD            )
     ASSOCIATION, UNIVERSITY OF            )
25   CALIFORNIA SAN FRANCISCO              )
     MEDICAL CENTER, SUTTER EDEN           )
26   MEDICAL CENTER, ALAMEDA HEALTH        )
     SYSTEM, DR. YOUSSEF E. YOUSSEF,       )
27   VERONICA PERAZA, HYUNJI AHN,          )
     SARA DULL and DOES 1-10, inclusive    )
28   _____ )

                              -1-

**IT IS HEREBY ORDERED:**

**1. IMMEDIATE MEDICAL TRANSFER TO A SAFE, QUALIFIED FACILITY**

Defendant the Regents of the University of California shall, within twenty-four (24) hours of service of this Order:

a. Arrange Plaintiff's immediate transfer to a qualified medical facility outside of the UC Regents hospital network that is capable of providing comprehensive care, including:

- 24-hour physician oversight by board-certified internal-medicine or hospitalist staff;
- Registered nurses certified in central-port access and IV infusion management;
- Daily wound-care services by certified nurses;
- Aggressive physical and occupational therapy totaling at least 7-10 hours per week, as previously prescribed;
- Two-person assistance for all mobility and activities of daily living;
- Infection-control protocols meeting state and federal standards.

b. Coordinate with Plaintiff's chosen representative to ensure Plaintiff's active participation in all discharge planning and placement decisions.

c. Provide Plaintiff and his representative with a written discharge plan at least twenty-four (24) hours prior to any future transfer or discharge, identifying the receiving facility, clinical capabilities, attending physician, and continuity-of-care plan.

d. Comply fully with Livanta QIO's October 8, 2025 determination finding the October 6, 2025 discharge unsafe and requiring corrective action.

**2. ENFORCEMENT OF OPM'S AUGUST 18, 2023 FINAL DECISION**

Defendants Blue Cross Blue Shield Association (BCBSA), including its California administrator Blue Shield of California (FEP), shall, within twenty-four (24) hours of service of this Order:

a. Implement and honor the U.S. Office of Personnel Management's Final Agency Decision dated August 18, 2023 (Control No. Y23173003) authorizing Long-Term Acute Care (LTAC) hospitalization for Plaintiff;

b. Authorize and pre-certify LTAC benefits for admission to an LTAC Hospital with capacity to provide long-term acute hospital-level care, complex wound management, IV therapy through a central port, and continuous physician oversight;

c. Provide written confirmation of LTAC authorization to Plaintiff and to this Court;

d. File a status report with this Court within five (5) days confirming compliance with OPM's directive and detailing steps taken to identify a qualifying facility.

**3. CORRECTION OF DISCRIMINATORY AND DEROGATORY MEDICAL RECORD CHARACTERIZATIONS**

Defendants the Regents of the University of California, and all other hospital provider defendants shall:

a. Identify all medical-record entries, progress notes, or referral documents containing non-clinical, stigmatizing, or derogatory labels describing Plaintiff as "non-compliant," "difficult," "hospital hopper," or similar language;

b. Within seventy-two (72) hours of service of this Order, append to each such entry a clarifying addendum stating:

"This notation does not reflect patient misconduct. It relates to medically documented disability-related needs requiring specialized care. Plaintiff's advocacy for safe treatment and continuity of care is consistent with his medical condition and protected under federal law."

c. Transmit corrected records and addenda to every facility, insurer, and case-management vendor that received the uncorrected version;

d. Refrain from including any similar non-clinical, stigmatizing, or retaliatory language in future medical records, discharge summaries, or referrals concerning Plaintiff.

**4. PLAINTIFF'S RIGHT TO PARTICIPATE IN ALL FUTURE DISCHARGE PLANNING**

Defendants the Regents of the University of California, and any successor facility shall:

a. Recognize Plaintiff's right under 42 C.F.R. § 482.43 and 42 C.F.R. § 483.10 to participate fully in the development, review, and revision of his discharge and care-transition plans;

b. Provide Plaintiff and his representative written notice of any proposed discharge or transfer at least seventy-two (72) hours in advance, including specific clinical justification and destination information;

c. Obtain Plaintiff's written acknowledgment of the discharge plan before implementation; and

d. Maintain ongoing communication with Plaintiff and Plaintiff's designated representative throughout placement and post-discharge care.

**5. NON-RETALIATION**

All Defendants, their agents, employees, and contractors shall refrain from any form of retaliation or adverse treatment arising from Plaintiff's exercise of rights under federal or state law, including:

a. Threatening discharge or transfer for asserting legal rights;

b. Denying, delaying, or reducing medically necessary care;

c. Creating or disseminating additional stigmatizing notations in records or communications.

**6. MONITORING AND STATUS CONFERENCE**

All Defendants shall appear at a status conference within seventy-two (72) hours of entry of this Order to report:

- Plaintiff's current medical condition and placement;
- Regents' compliance with safe-placement directives;
- BCBSA's compliance with OPM's LTAC authorization; and

-3-
PROPOSED ORDER

1  • Any obstacles to full compliance and continuity of care.

2

3  **7. ORDER TO SHOW CAUSE AND PRELIMINARY INJUNCTION HEARING**

4  This Court sets an Order to Show Cause hearing within fourteen (14) days of entry of this
   Order to determine whether to convert this Temporary Restraining Order into a Preliminary
5  Injunction. This Temporary Restraining Order shall remain in effect for fourteen (14) days
   from the date of this Order, or until the preliminary injunction hearing, whichever occurs first.

6  **8. BOND**

7  Pursuant to Federal Rule of Civil Procedure 65(c), the Court waives the bond requirement, or
   in the alternative, sets bond at One Hundred Dollars ($100.00).
8
   Plaintiff seeks only enforcement of existing federal obligations, not imposition of new
9  burdens. Due to the high costs of Plaintiff's care needs, Plaintiff is incapable of posting a
   substantial bond. Defendants suffer no harm from compliance with existing legal duties, and
10 the public interest in protecting a medically fragile individual outweighs any financial
   considerations. See *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009).
11

12

13 **IT IS SO ORDERED.**

14 Dated: _____

15

16                     _____

17                          HONORABLE RITA LIN
                            United States District Judge
18

19

20

21

22

23

24

25

26

27

28

-4-